Chester J. SANDS and Estella Sands, Plaintiffs-Appellants-Respondents,

v.

R. G. McKELVEY BUILDING Co., Defendant-Respondent-Appellant.

Nos. 39201, 39202.

Missouri Court of Appeals, St. Louis District, Division Two.

Aug. 22, 1978.

Motion for Rehearing and/or Transfer Denied Oct. 13, 1978.

Application to Transfer Denied Nov. 6, 1978.

Robert E. Morley, O'Fallon, for plaintiffs-appellants-respondents.

L. W. Boschert, St. Charles, for defend-ant-respondent-appellant.

STEPHAN, Judge.

This suit arises from the construction of a home for Chester and Estella Sands in St. Peters, Missouri, by the R. G. McKelvey Building Company. Because the parties have filed cross appeals, they will be referred to as they appeared in the court below. Pursuant to a jury verdict plaintiffs Sands were awarded $3,000 in actual damages. For reasons hereinafter stated, we reverse and remand for a new trial.

Plaintiffs' petition in the circuit court was in two counts. The first count alleged that defendant had breached an implied warranty of habitability in the sales contract by cutting and installing floor joists in an unskillful and unworkmanlike manner so as to provide inadequate support for the house. Count II repeated the allegations of Count I and further alleged that the joists were not constructed in compliance with the Building Officials and Code Administrators (BOCA) Code, duly adopted by ordinance by the City of St. Peters and in effect at the time of the construction of the home. Each count asked for $10,000 in actual damage and costs; Count II, alleging a "deliberate, willful and malicious" violation of the St. Peters ordinance, also sought punitive damages in the amount of $10,000. At the close of the evidence, the trial court sustained defendant's motion for a directed verdict as to punitive damages. The court also, on defendant's motion, required plaintiffs to choose between Counts I and II for the reason that submission of both theories of liability would open up the possibility of double recovery. Plaintiffs elected to proceed on Count II and submitted its case on a theory of per se negligence based on violation of the BOCA Code.

The floor joists here are "2 × 8" planks at the ceiling of the basement and comprise the supporting structure upon which the house is built. In this house, two steel I-beams, or girders, run the length of the basement ceiling at intervals of roughly one-third of the width. The joists are perpendicular to the girders, with one end resting on a girder and the other end on the nearest concrete foundation wall, or in the center section with the ends resting on each girder. The joists rest on edge, and on this base is built the floor of the first story of the house.

The events leading up to this suit are these: On October 6, 1974, plaintiffs signed a contract to purchase a home in a subdivision being developed by defendant in St. Peters. The home was to be identical to a model home which the Sands had inspected in the subdivision except for the inclusion of a small number of optional extras; all plans and specifications were therefore the product of defendant. The house was built between October and December and the closing completed on December 10. The BOCA Code requires that joists resting on a girder must bear four inches on the girder. On an acknowledgement of acceptance form signed at the time of the closing, plaintiffs made note of a number of small items that needed completion or repair. Included among these was a single joist which, as Mr. Sands had noticed upon a brief inspection prior to the closing, had no bearing at all on the girder. Mr. Sands did not discover that many of the other joists were shorter than required by the Code

until several weeks after the sale was closed.

In response to plaintiffs' complaints in the matter, defendant sent two carpenters back to the house to install some additional joists, thirteen to sixteen in number, next to those about which plaintiffs were particularly concerned. The efficacy of this repair was the subject of much dispute at the trial. Defendant's president, Mr. Robert G. McKelvey, testified that, although the joist system was originally not in compliance with the BOCA Code, it was nonetheless structurally safe even before the repair work with the exception of the single short joist; and that after the doubling of a number of the joists, the house was safe. Mr. Rayford Pickett, a civil engineer who had been the St. Peters city engineer at the time the house was built, testified that the joists, as corrected, complied with the BOCA Code and that the repairs provided the house with a "much better" bearing surface and "much stronger" structure than it would have had if the system had originally complied minimally with the Code. Pickett indicated that his testimony was based on an inspection made over two years after the house was built, that he saw no evidence of sag or deflection in the floors, and that such sag would normally occur within six months of construction if the system were defective. Mr. Ben Kirchner, the city inspector for St. Peters, testified that on the basis of an inspection made even before the repair work was done, he "passed" the house despite the short joists. Kirchner testified that it was common practice to install joists with an inch and a half to two inches of bearing (as had most of the joists in question here), that as city inspector he regarded such a support system adequate for the house, and that plaintiffs had sustained no damage due to the construction of the joists in this fashion. Much of this testimony was disputed, however, by plaintiffs' witness, Mr. Ward Emigh, a private consulting engineer who made an in-spection of the house at plaintiffs' request approximately a year after plaintiffs had moved into it. Emigh testified that as originally constructed, some twenty-eight joists in the house had inadequate bearing and violated the BOCA Code in other respects. He further testified that, even as repaired, the joists did not comply with the BOCA Code and that the added joists would provide no additional structural strength whatever because they were warped and improperly installed. He, therefore, discounted their effect altogether. Emigh indicated that he too saw no evidence of sagging in the floor, but believed that should there be any movement at all in the foundation, there would be inadequate reserve strength to support the eastern side of the house, where the problem was most acute.

After Emigh's inspection, plaintiffs asked another builder, Mr. Henry Stealey, to give them an estimate of the cost of certain repair work. Stealey estimated that it would cost $558[1] to remove ten of the replacement joists which defendant had added and to install eighteen new ones. Stealey was not asked his opinion of the necessity of these repairs; plaintiffs designated the items of repair on which they wanted an estimate. There is no evidence in the record as to whether such repairs would have put the house in strict compliance with the BOCA Code.

Plaintiffs' dissatisfaction with the house grew to the point that "We were so disgusted we were glad to get out." After only twenty months of occupancy, they sold the house on July 1, 1976. They asked for and received $32,500, which represented the original purchase price plus the cost of minor improvements (unrelated to the joists) which they had made. The new purchaser testified that Mr. Sands told them that he only wanted to get out of the house what he had put into it. The new owners were fully apprised of what plaintiffs considered to be the defects in the house. Mr. Sands

---

1. There is some question in the transcript as to whether Mr. Stealey testified that he would charge plaintiffs $558 or $676 for the removal of ten joists and the installation of eighteen new ones. He testified that the cost of materials would be $118, and the confusion arises from whether his reference to $558 does or does not include the cost of materials.

testified that a fair market price for the home, had it been properly constructed, would have been $35,000; the new owner gave an estimate of $36,000 or more. At the time of the trial, more than two years after construction was completed, there was still no evidence of sagging in the floors.

On appeal, defendant complains (1) that the verdict is excessive in view of the evidence that replacement of eighteen joists would have cost $558; (2) that the court erred in giving MAI 4.01, proffered by plaintiff, as the measure of damages instruction; (3) that the court erred in giving the verdict director, a modified form of MAI 17.18 (Per se Negligence—Violating Speed Limit); (4) that the court erred in refusing to clarify the instructions after the jury made such a request in writing during its deliberation; and (5) that the evidence did not support a submission to the jury that a violation of the BOCA Code ordinance could be found to be the proximate cause of plaintiffs' loss. On their appeal, plaintiffs contend that they should have been allowed to seek punitive damages.

■ We hold that, in giving MAI 4.01 rather than 4.02,[2] the trial court committed error warranting a new trial. Supreme Court Rule 70.01(b)[3] states that when an MAI is "applicable in a particular case . . such instruction shall be given to the exclusion of any other on the same subject." It has been the policy of the courts to require strict compliance with the requirements of MAI. In general, when an MAI is applicable, its use is mandatory. *DeArmon v. City*

of St. Louis, 525 S.W.2d 795, 800 (Mo.App. 1975); *Siteman v. Woodward-Clyde & Associates, Inc.*, 503 S.W.2d 141, 145 (Mo.App. 1973). Any deviation from or unnecessary modification of the applicable MAI is "presumptively prejudicial." *State ex rel. State Highway Commission v. Beaty*, 505 S.W.2d 147, 154 (Mo.App.1974); *Siteman, supra*, 503 S.W.2d 145. In this case, the highlighted titles of the two MAI's clearly indicate that 4.01 is to be used when personal or both personal and property damages are claimed and 4.02 is to be used in cases of property damage only. The Notes on Use to 4.02 state that "This instruction should be used in cases involving property damage only." The Committee's Comment on 4.02 states that "Where *both* personal and property damages are involved 4.01 must still be used." The Notes on Use are to be "religiously followed". *Royal Indemnity Co. v. Schneider*, 485 S.W.2d 452, 458 (Mo.App. 1972).

■ The cases cited by plaintiffs, *Jack L. Baker Companies, Inc. v. Pasley Manufacturing & Distributing Co.*, 413 S.W.2d 268 (Mo.1967), *Stamm v. Reuter*, 432 S.W.2d 784 (Mo.App.1968), *Boten v. Brecklein*, 452 S.W.2d 86 (Mo.1970) and *North County School District v. Fidelity & Deposit Co.*, 539 S.W.2d 469 (Mo.App.1976), are not persuasive. All four cases held that MAI 4.01 was the proper instruction in a suit for property damage only. However, the first three cases, *Baker, Stamm* and *Boten*, all involved trials which predated the effective date of the second edition of the MAI,

2. The instruction forms, as pertinent here, read as follows:

"4.01 Measure of Damages—Personal and Property

If you find the issues in favor of the plaintiff, then you must award the plaintiff such sum as you believe will fairly and justly compensate the plaintiff for any damages you believe he sustained . . . as a direct result of the occurrence mentioned in the evidence.

4.02 Measure of Damages—Property Only

If you find the issues in favor of the plaintiff, then you must award the plaintiff such sum as you may find from the evidence to be the difference between the fair market value of (here identify property) before it was damaged and its fair market value after it was damaged."

The supplemental notes on use relating to 4.02 provide:

"MAI 16.02 defining 'fair market value' must be given. In those rare cases in which the cost of repair is the appropriate measure of damages [as recited in the Committee's Comments] the instruction should read:

If you find the issues in favor of the plaintiff, then you must award the plaintiff such sum as you may find from the evidence to be the reasonable cost of repair of any damage to (here identify property)."

3. Since the date of the trial, Supreme Court Rule 70.01 has been renumbered 70.02 and amended in minor respects not relevant to this discussion.

September 1, 1969, when MAI 4.02 first appeared. At that time, therefore, 4.01 was the only MAI on personal or property damages and, under the dictates of Rule 70.-01(b), the courts rejected the argument that 4.01 was too general and therefore prejudicial in failing to designate specifically the items the jury was to consider in establishing property damages, i. e., the lesser of the cost of repairs or the diminution of fair market value. The court in *Boten*, supra, 452 S.W.2d 93, said that, "It is contemplated by MAI that where a general instruction of this kind [4.01] is given the jury will be properly advised by the argument concerning details. . . . We agree that, *at least until a more detailed form is provided in MAI*, it is appropriate to use 4.01." (Emphasis added.) The court in *North County School District*, supra, decided in 1976, faced the same issue as presented in *Boten* : whether MAI 4.01 was the proper damage instruction in a breach of contract case. Citing *Stamm* and *Boten*, the court held it was. MAI 4.02 was not mentioned and was apparently overlooked. We decline to follow *North County School District* and hold that MAI 4.02, given in either form, is precisely the "more detailed form" contemplated in *Stamm*, supra.[4] It clearly defines the elements of damage to be considered by a jury, as the general 4.01 does not. Following challenges to 4.01 such as those in plaintiffs' cases cited supra, the Missouri Supreme Court by adopting 4.02 in 1969 clearly indicated its unwillingness to allow the measure of damages to remain a matter of evidence and argument of counsel, as it had been up to that point. We do not believe this added clarification of the damage issue should be lost by our holding 4.01 acceptable in this situation.

In both *Ogle v. Terminal Railroad Association of St. Louis*, 534 S.W.2d 809 (Mo.App. 1976) and *State ex rel. State Highway Commission v. Beaty*, 505 S.W.2d 147 (Mo.App.

1974), reversals were granted where MAI 4.01 was used in property-damage-only cases. After establishing that 4.02 was in fact the proper instruction in that situation and that the burden was on the proponent of 4.01 to show conclusively that no prejudicial harm resulted from its use, *Ogle*, supra, 534 S.W.2d 812, *Beaty*, supra, 505 S.W.2d 154, both courts rejected the argument, also made by plaintiffs here, that the result under 4.02 would have been identical to that reached under 4.01 because the evidence would be identical under both instructions and the verdict reached conformed with that evidence. In *Ogle*, the argument was termed "pure speculation" and we deem it such in this case. Plaintiffs' evidence indicated that, without defects, the house could have been sold for $35,000 to $36,000, but that they in fact sold it for $32,500. However, we question whether the evidence in this case (specifically, that the joist system in this house was built in accord with the usual practice in St. Peters and that plaintiffs asked for no more than $32,500) would necessarily support a finding that plaintiffs sold the house for its fair market value at the time of sale. By instructing the jury to "fairly and justly compensate" plaintiffs should it find in their favor (MAI 4.01) rather than to award the diminution in fair market value (4.02), the trial court provided an unfocused instruction which could permit a jury to gloss over that question altogether. That is precisely the situation that the Supreme Court sought to avoid by adding 4.02 in 1969. Furthermore, we question whether diminution of fair market value is the proper measure of damages in this case. Evidence indicated that substantial repair could have been performed on the joists for $558, although, as noted, it is unclear whether such repair would have put the home in strict, or even substantial, compliance with the

---

4. In other cases which were tried subsequent to the promulgation of MAI 4.02, the use of 4.01 has been approved in spite of the absence of personal injury. See *O'Dell v. Custom Builders Corporation*, 560 S.W.2d 862, 873 (Mo. banc 1978); *S. P. Personnel Associates of San Antonio, Inc. v. Hospital Building & Equipment Co.,* *Inc.,* 525 S.W.2d 345, 350 (Mo.App.1975). However, in none of the cases was the issue raised as to the propriety of 4.01 vis-a-vis 4.02, the attack being made on other grounds. We, therefore, do not feel constrained to follow those cases.

BOCA Code. However, the form of MAI 4.02 to be used will depend on the evidence adduced upon retrial.[5] We simply decide here that plaintiffs have not met the burden of making it "perfectly clear", *Murphy v. Land*, 420 S.W.2d 505, 507 (Mo.1967), that no prejudice resulted from the use of 4.01. We agree with what was said in *Beaty*, supra, 505 S.W.2d 154–155, that "if, in fact, we accept plaintiff's premise [i. e., that the result would have been the same], then we will have said that MAI 4.02 is unnecessary in any property damage case, as 4.01 can perform the same function if the proper measure of damages is forthcoming from the testimony in the case." Because MAI 4.01 was given, the case is remanded for retrial.

██ We now turn to the other assignments of error which relate to matters which may arise on retrial. Defendant alleges error in the giving of the verdict director and contends that the evidence was such as to preclude a jury finding that a violation of the BOCA Code was the proximate cause of any loss suffered by plaintiffs. Both of these points go directly to the theory of liability on which plaintiff elected to go to the jury: per se negligence in the violation of an ordinance directed toward the establishment of minimum safety standards in building construction. Whatever merit such a theory could have been argued to possess at the time this case was tried,[6] it must be abandoned upon retrial. After argument and submission of this case, the Supreme Court of Missouri handed down its decision in the case of *Crowder v. Vandendeale*, 564 S.W.2d 879 (Mo. Banc 1978), which thoroughly explicated the relationship between a homebuilder-vendor and the first and subsequent vendees. In *Crowder*, wherein the plaintiff,

who had purchased from the first vendee, sought recovery from the builder, the court concluded as a matter of public policy that the relationship between the builder-vendor and the first purchaser is grounded in contract "and that a second theory of recovery based on failure to use ordinary care should not be authorized." Id., 884. Thus, upon retrial, plaintiffs may not employ a verdict director founded upon the tort theory of negligence per se. In the present state of the law, we believe that, while a violation of the BOCA Code may be relevant to the issue of habitability, it is not conclusive. We note that the plaintiffs tendered to the trial court MAI 25.03, Breach of Warranty of Fitness for Particular Use, as their verdict director in connection with Count I. It was not given when plaintiffs were required to elect as between the counts and opted for Count II. We cannot foretell what the evidence will be if this case is retried. However, such an instruction may be appropriate.

We do not address defendant's remaining point, that the trial court erred in refusing to submit a clarifying instruction when it received a written inquiry from the jury during its deliberations. The inquiry was, "Are we to consider the four inch on center question based on original or repair construction?" As defendant points out in its brief, the question was undoubtedly occasioned by the use of the word "occurrence" in MAI 4.01. Use of a properly modified form of MAI 4.02 should prevent the problem from arising on retrial.

██ On their appeal, plaintiffs argue that the trial court erred in refusing to submit the issue of punitive damages to the jury. Because of the facts of this case, we

---

**5.** Depending on how that evidence develops, MAI 4.03 could conceivably be the appropriate measure of damages instruction. See Notes on Use and *Matulunas v. Baker*, 569 S.W.2d 791 (Mo.App.1978).

**6.** The right of the first purchaser of a home to recover against the builder-vendor for latent defects in its construction on the theory of implied warranties of merchantable quality and fitness was initially recognized in *Smith v. Old*

*Warson Development Company*, 479 S.W.2d 795 (Mo. banc 1972). It was not critical to the disposition of that case to determine definitely whether the cause of action sounded in tort or contract, for the right of recovery arose from the fact of the purchase from the builder, i. e., the warrantor. See also the analysis of *Old Warson* in *O'Dell v. Custom Builders Corporation*, 560 S.W.2d 862, 870–871 (Mo. banc 1978).

agree. As pointed out by *Crowder*, supra, this case is one in contract. While the general rule is that punitive damages are not recoverable in a case arising out of a breach of contract, there are exceptions "where the breach amounts to an independent, willful tort and there are proper allegations of malice, wantonness or oppression." *Wallick v. First State Bank of Farmington*, 532 S.W.2d 520, 524 (Mo.App. 1976); *Williams v. Kansas City Public Service Company*, 294 S.W.2d 36, 40 (Mo.1956).

■ In this case, plaintiffs pleaded that the violation of the BOCA Code by the defendant was willful, deliberate, and malicious. Moreover, the BOCA Code, as an ordinance of the City of St. Peters, enjoined upon defendant the duty of conforming to it at peril of responding in damages, at least to any first purchaser injured by its failure to do so. The first purchaser of a newly constructed house is clearly a member of the class for whose benefit the ordinance was enacted, and it is equally clear that the purpose of the ordinance is to protect persons, property, health, or public safety. Under such circumstances when an ordinance violation is the proximate cause of a loss, the courts of this state recognize a cause of action. *Moore v. Riley*, 487 S.W.2d 555 (Mo.1972); *Washington University v. Aalco Wrecking Co., Inc.*, 487 S.W.2d 487, 491 (Mo.1972). Furthermore, it is a well established principle that where the violation is accompanied by the element of legal malice, i. e. willful and known to the defendant to be wrongful, punitive damages may be awarded by the jury.[7] *Hall v. St. Louis-San Francisco Ry. Co.*, 224 Mo.App. 431, 28 S.W.2d 687, 691 (1930); *Patrick v. Employers Mutual Liability Ins. Co.*, 233 Mo.App. 251, 118 S.W.2d 116, 126 (1938). See also *Cheek v. Prudential Ins. Co.*, 192 S.W. 387 (Mo.1917).

■ In determining whether plaintiffs made a submissible case on the issue, we review all the evidence in the light most favorable to plaintiffs, giving them the benefit of all favorable inferences reasonably drawn therefrom and disregarding defendant's evidence to the contrary. *Grossman Iron & Steel Co. v. Bituminous Casualty Corp.*, 558 S.W.2d 255, 258 (Mo.App.1977); *Boyle v. Colonial Life Insurance Company of America*, 525 S.W.2d 811, 815 (Mo.App. 1975). The issue should have been submitted to the jury if there was any evidence of conduct which would justify the awarding of punitive damages. In this case, defendant corporation had built some seven hundred houses in the City of St. Peters; defendant's president was familiar with the Code and its requirements relating to bearing on girders. He admitted that more than thirteen joists in the plaintiffs' home were short and did not comply with the Code. From other evidence the jury could have found twice that number to be short. The defendant was the most active builder in St. Peters; and, according to the building inspector, it was common practice to build homes in St. Peters with joists bearing only one and one-half to two inches on I–beams. From such evidence the jury could have found a willful violation of the Code committed with knowledge of its wrongfulness. Thus, the breach of the contractual relationship here, *Crowder v. Vandendeale*, supra, could be found to have amounted "to an independent, willful tort". *Wallick v. First State Bank of Farmington*, supra. Therefore, it was error for the trial court to refuse to submit the issue of punitive damages to the jury.

The judgment is reversed and the cause remanded for new trial consistent with this opinion.

STEWART, P. J., and REINHARD, J., concur.

---

7. "The test to be applied in determining whether malice existed as a basis for the award of punitive damages is whether the defendant did a wrongful act intentionally and without just cause or excuse. 'This means that defendant not only intended to do the act which is ascertained to be wrongful but that he knew it was wrongful when he did it. There must be, in order to justify punitive damages, some element of wantonness or bad motive, but if one intentionally does a wrongful act and knows at the time that it is wrongful he does it wantonly and with a bad motive.' *Beggs v. Universal C.I.T. Credit Corporation*, 409 S.W.2d 719, 722 (Mo.1966).